I represent John Borodkin in this and I'm here today to ask this court to uphold the standard of review for a summary judgment. That standard of review is enunciated in many, many Ninth Circuit cases that the summary judgment is appropriate only where the requesting party, the moving party, has demonstrated there is no genuine issue of material fact. Material facts are identified as those which might affect the outcome of the case and an issue is genuine if a reasonable jury, a reasonable prior of fact, could find in favor of the non-moving party. The principle basic genuine issue of material fact involved in this case was whether or not the valid test. Why does it turn on that when Nevada has an employment at will provision? The basic at will provision is tied to legislation or a statute which promotes a fundamental public policy, in this case a fundamental public policy. What does Nevada law provide? Nevada law says that you can fire at will. You can fire for any reason or no reason at all. There is an exception to that. That exception is the public policy exception. Is that term defined? The term is defined in other cases. Nevada has not defined that term, to my knowledge, public policy. To my knowledge, Nevada has not specifically found that the federal aviation regulations relating to aviation safety reflect Nevada's public policy. I don't think there's a question that the particular regulations or the particular statutes involved here, the statutes which are intended to detect and to prevent intoxicated pilots from flying airliners, are not a matter of fundamental public policy. That may be, but you're relying on the adverse of that. You're essentially relying on the fact that there was no requirement under this regulation that he submit to the test. So what's the public policy you're relying on? Not an intoxication public policy, so what is it? The public policy I'm relying on is the standard of care which is provided by the federal statutes and the federal regulations. That standard of care is that the tests, these alcohol and drug and alcohol tests, will be given, the random tests that is, will be given to pilots who are just before attempting to perform their safety-related duties. So you're relying essentially on a privacy interest that's embedded in the regulations saying that you only have to submit to this test under these particular circumstances and not others? That's correct. Because it's not others that you're relying on, right? You're relying on the fact that he didn't have to take the test. That is correct, Your Honor. He did not have to take the test. He was not on duty. He was not just before attempting to fly an airplane. He was completely off duty. So what? Second? So what? So what? The public policy, the fundamental public policy, within the regulation and within the statute is to detect and deter those pilots who might attempt to fly an airliner under the influence of alcohol. We don't have a situation where he's fired for refusing to take a test and say, look, the regulation says, I don't have to take the test. And they say, well, in that case, you're fired. They didn't do that. He goes in and takes a test. He flunks a test. And then where's the public policy there? He was coerced to take the test. He was told, if you do not take the test, we'll report it as a refusal. A refusal to take the test is assumed to be a positive test, in which case this pilot who has devoted 25 years to building a career as a professional pilot is now forever forbidden from flying an airplane again. His career is ended. So he refused to take the test when he was coerced? If he did refuse. No, no, not an if, I'm saying. OK. He did not refuse because he was coerced under those circumstances. Of course he didn't refuse. I understand. So you say, look, I'm not going to take the test. And they say, well, we'll fire you if you don't. That's coerced. But this can read the record. He was told to take the test. He took the test. He flunked. He was told to take the test that if he did not take the test, he would be fired and it would be reported. He was told that if he did not take the test, it would be reported as a refusal. And he would be fired. Both of those things. The reporting of a refusal, it has the same effect as a positive test. He is from then on for the rest of his life forbidden to fly an airplane, which is his career. Counsel, he's. Omni can fire him at any time for any reason. Yes, they could. They can call up and say, we don't like your attitude today. You're fired. Now, the problem is, is that they have explained they subsequently explained Trans-Northern that they fired him because he failed an FAA alcohol test. That's correct. Now, if Omni had had called him while he was in Alaska, say, two days before he was supposed to go on duty, he wants to go down and take an FAA test. And Mr. Brockton had said, well, that's that's not reasonable. I'm I'm I'm at home. I'm not working this week. Why should I take an alcohol test? Of course, I'm drinking. This is what I do here in Alaska when I'm not working. That would be that might that sounds sort of unreasonable for them to require that. Is that your argument that this is this is unreasonable for them to offer this as a reason for why they're firing? So they could fire him for any or no reason at all. They can fire him for any or no reason at all. The problem is the firing. The problem is the explanation to Trans-Northern that they fired him because he failed the FAA alcohol test. The explanation to Trans-Northern and the explanation they sent to the Federal Air Surgeon. In fact, they did fire him for that reason. That is why they fired him. They did fire him because he allegedly failed a DOT FAA alcohol test. Is there any Nevada case law that recognizes a Federal regulation as being the basis for a wrongful term for a wrongful termination tort in Nevada? The Nevada courts, apparently, to my knowledge, have not addressed that issue. All right. Is there any Nevada case law that recognizes a as a tortious discharge? A something that doesn't involve a whistleblowing kind of situation? I don't know, Your Honor. There may be. There may not be. I'm not aware of any. I know that the California Supreme Court has found that the federal aviation regulations do provide a fundamental public policy statement in that they refer to aviation safety. That's Greenridge's Israeli engineering, which is included in the briefs. But this is the outburst of that. You're not relying on something that's protecting safety. You're relying on something that you're relying on the notion that he could do this despite a regulation protecting safety. You're not relying on any safety protective aspect of this. Yes, we are, Your Honor. In what way? During the promulgation of these regulations and the statute itself, the issue of whether or not a pilot could be tested while he was off duty, randomly tested while he was off duty or on reserve, was addressed and discussed at considerable length. The purpose of the random testing was to catch those pilots, to detect and deter those pilots who might show up and take a flight. This isn't necessary to that end, but you're not relying on a safety protective, on the fact that he was fired for some reason that would make things less safe. He was fired because he allegedly failed the test. The test itself was invalid because it was given, it was performed on him when he was off duty and it was coerced. But it's not impeding any safety protective aspect of the FAA regulations for him to be fired, right? It's not going to make things less safe if he doesn't fly. If he doesn't fly, it will not make things less safe. What it does, Your Honor, is it gives the small airlines a clear precedent that they do not need to follow those aviation safety regulations that are designed to catch the pilot who will show up and fly. They're not required to follow anything at all. They can just say, as Barry said, we don't like your face today, you're fired. For firing, that's true, Your Honor. That's what Nevada law provides for. That's what Nevada law provides for you, that's very true. In this event, they didn't simply fire him. They could have fired him for no reason at all, and there would have been very little damage done. It appears that he may in fact have been fired. Perhaps he should not have been fired because of this regulation. But the problem, I gather, is that there is no federal cause of action relating to firing. That's the problem, right? So you're trying to create one under state law. That's essentially what's happening here. I believe that if the state of Nevada has not addressed this issue, it should. Yes, Your Honor. Let me move this down the road just a little bit. Let's suppose that Omni said in its heart, we have fired you with good cause, although we can fire you for no reason at all. We fired you for good cause because we ordered you to take an FAA test at a time when we believed you were on duty. You failed the FAA alcohol test, and that entitles us to report that to Trans-Northern. That's your client's real problem is he can't get the next job, because Trans-Northern sends Omni a questionnaire and says, did you ever fire this guy for alcohol-related causes? And Omni now says, yes, we did. Now, that's where the real damage is. At that point, Trans-Northern sends a second questionnaire to Omni. And on the cover of the fact sheet, somebody in Atlaska says to Omni, by the way, this guy's been cleared by the FAA. They've expunged his record. So evidently, for whatever reason, the FAA doesn't believe that he really failed this test. Now, Omni goes ahead and fills out the second questionnaire and continues to answer that, yes, he failed an FAA test. What was Omni supposed to do? Omni didn't have the FAA records. They didn't know anything about the expungement. Omni hadn't provided anything to them. Trans-Northern hadn't provided anything to them. Omni only had its own records. Omni had its own records. Yes, it did, Your Honor. Omni had its own records, under which they knew when they administered the test and later, when they responded to the Trans-Northern request and when they responded to the Federal Air Surgeon, Omni knew that the test as given was invalid. No, they didn't know that. They believed that this was, I give you that as a stipulation. They believed that this test was valid. They believed they'd given it at a valid time. And they're answering what, they're answering the question based on what they have in their files at the time the questionnaire comes from Trans-Northern. Now, how are they supposed, Trans-Northern has evidently tried to get them to change their answer. But why should Omni change an answer that it has no basis for? It can only look in its own files. It doesn't know anything about what the FAA is doing. If it had, maybe it would have reconsidered. But nobody on Trans-Northern's part, and certainly not Mr. Borodkin, has advised Omni at the time it's filling out the questionnaire that the FAA has expunged the record. No, they have not. Omni, it would have been improper for Omni to have answered this question in any other way than it answered it. So how can that be the basis for a defamation suit? I do not agree. Omni was charged with the knowledge of the regulations, of the federal aviation regulations, and of the statutes supporting those regulations. The management at Omni is supposed to know what the rules are. And they did know what the rules are, their own policy manuals, their own alcohol policy allowed for a pilot on reserve to consume alcohol. If called for a flight, then he must decline the flight until eight hours have passed. Mr. Borodkin was never called for a flight. Did your client have no other way to straighten this out swiftly? There was no internal FAA mechanism for him to get a declaration from the FAA, which would then be communicated back to his employer that this was erroneous? The FAA made their decision after a thorough investigation. And it was late. Because the FAA was not advised of the alleged failure for some four months until October. Why didn't he advise? Couldn't he have gone to the, is there any way he could have just gone to the FAA right away and said, they fired me claiming that I failed an FAA test, but in fact they don't understand the regulations, and I really didn't. In the record, Captain Borodkin did ask the FAA inspector who was the one in charge with processing the violation, the revocation of his pilot certificates. He did ask that inspector to advise Omni of his, of the decision that the FAA had made, that there had been no violation of the FARs. There was no way that he could force that FAA inspector to actually do that. When did Mr. Borodkin first learn that the FAA had cleared him? That, I believe, was in February. Okay, he doesn't get the letter from the FAA until June. Say again? He doesn't get the letter from the FAA until June. That's correct. Okay, but February would also be after the first questionnaire sent from Trans-Northern to Omni, which was in January. That's true. Okay, so the only opportunity that Omni has to correct the record would be in April, when Omni doesn't know anything more than anybody else does about this proceeding. Omni had the first opportunity to correct the record in July, actually on July the 14th and July the 15th of 2004, when Captain Borodkin said to them, I was not on duty. I should not have been given this test. And he said, I want you to listen to the tape recordings of my telephone conversations with scheduling, wherein they told me I was not to report to duty on reserve until five o'clock on the 14th of July. And Omni said, we will listen to those tapes. And then they said, well, we listened to the tapes. We didn't find anything pertinent on those tapes, so we destroyed them. And this was after Captain Borodkin had said, I wish to have my attorney listen to those tapes as well. But more generally, what is bothering me about this whole situation is that, as you're portraying the FAA system, there is no way, federal way, for a pilot who is mistakenly fired for violating FAA regulations to right that wrong under any federal system. Is that what you're telling us? There is not a federal remedy. No, ma'am, there is not. The Federal Aviation Administration did expunge the record, which is very unusual. Which means he can be employed as a pilot. Which meant that, according to the FAA record, this test never happened. So he can be employed as a pilot. He could be employed as a pilot. But then we come into the Pilot Records Improvement Act, whereby the new employer must inquire of the former employer, why did this man leave your employer? Presumably now the employer couldn't tell them anything other than what it now knows, which is that he is allowed to be a pilot. The employer knew this, Your Honor, back in July of 2004, when they actually listened to the tapes. Well, we don't know that. I mean, we don't know that. But we do know now that they know it, right? So presumably now they couldn't tell anybody something else. And the employer was charged with the knowledge back in July of 2004 that they could not give their own company tests, that they had to give just only this DOT FAA test, and it had to be done under these circumstances, that the pilot is, quote, just before attempting to perform. I take it this is not a union carrier, and there was no collective bargaining agreement, there would've been a grievance, and this would've been straightened out. I'm sorry, Your Honor. This is not a union carrier. It's not a union carrier, no. If there were there would've been a collective bargaining agreement, there would've been a grievance... There was a collective one. ...and this matter would've been straightened out, or could've been straightened out. There was no collective bargaining... You have less than a minute. Do you want to save it for a bottle? I'm sorry, Your Honor? You have less than a minute. Do you want to save that for a bottle? Yes, Your Honor. I would like to save that if you want. OK. May it please the Court, I surmise that this Court has seen an awful lot of orders on summary judgment that have crossed the Ninth Circuit bench in the last year, but I would bet, and I think that would be legal in this city, that there haven't been many more thorough than what was submitted by Chief Judge Proe from the Nevada District on this litigation. One of the issues which the Court seems to be struggling with here is, do we even have to get to whether this was a legitimate test or not? Obviously, that was a portion, an important portion of the plaintiff's complaint. Is there a tort here? Yeah, well, because in Nevada, at Will State, if the firing is not against public policy, it wouldn't matter whether he has taken a test that was violative of the Federal laws or not. But what should him, and this is what keeps bothering me, is there no system for, let's suppose he's, let's assume from my hypothetical that he's ultimately correct, i.e. that you, that the carrier was wrong about its interpretation of the FAA regulations, that he should have been subject to a random test and he should have been fired for that reason. What was his, what should he have, what could he have, should he have done about it? Well, there was no private cause of action or private remedy under the Federal Aviation Administration's testing procedures, which were 14 CFR section 121 I and J. But there was something in these Federal regulations that related to pilots that allowed him to go to the FAA and to get the record cleared at some subsequent time. So that was his remedy, was that if he thought he was fouled by some improper conduct, he had a remedy, and I can't tell you what it is right now, but it worked. If Trans-Northern were to send the same questionnaire to Omni today, would they, would Omni be obligated to answer it in the same way that it answered it on the two previous occasions? No, not if it had actual knowledge that the record had been cleansed. So if, so if it knows that the FAA record has been cleansed, then Omni won't say, well, irrespective of what the FAA told you, yes, we fired this guy for alcohol. So Omni would answer the question no today. That's correct. I mean, when they answered the first question, they had no knowledge that there was anything amiss. I mean, they thought they had given him a test while he was on reserve. Well, they argue that they had, Bergerkin argues that, in fact, they were charged with the knowledge that they had given a defective test, and he provided information. He says, listen to the tapes, and they not only didn't correct it, but they also destroyed the tapes. Now, we have to accept that as a gospel truth, right? I don't think you accept it as a gospel truth. There was a ruling by this court, this district court, that said, we examined the records, the undisputed material facts in this case, and we find that there was no malice in terms of the submission of the second report by Omni. And we find that there was nothing. Thank you, partner. Yeah, I don't understand what you asked my question. This is what he claims. This is summary judgment. How is it that we don't accept as absolutely true what he claims? Well, I think that at the lower level, Your Honor, the district court was given a set of undisputed facts. Your job here is to review those facts de novo and to review what was in front of the district court, not things that may be added since the decision had been made. And so this was a set of stipulated facts? The summary judgment was a stipulated fact? There were 32 statements of undisputed facts that were set forth in the brief by Omni. So this allegation that counsel makes here that Borodkin said, no, I was on duty, I was told I didn't need to report, you listened to the tapes, and you will see all of this is not in the record? He didn't present an affidavit to that effect? He didn't present any specific undisputed facts as set forth in the summary judgment rules. You know, I ask a question and you answer with something else. This is not going to work. Okay, give me an answer that doesn't track my question isn't going to get, do you understand my question? I think if your question is, is there an affidavit? No, do you understand my question? I believe I do. If you don't, I'll repeat it. Do you understand my question? Do you have any doubt about what my question is? Let me hear it again, judge, just so I'm clear. Was it not, are you saying there was not an affidavit or declaration for Mr. Borodkin that he told your client, I was not on duty, check the tapes and you will be convinced? I think there was an affidavit, your honor, that was submitted in connection with his papers. Okay, so that took a long time. This being summary judgment, we have to accept the affidavit as absolutely true. True or false? Yes or no? That's true. Okay, we accept that as true. We accept this true that in fact, he tells them, look, I was not on duty. You can check the tapes and the tapes will confirm it. We accept that as the truth. Why doesn't, why isn't there a pretty good case for defamation if in fact they don't do that? Well, there's two reasons, your honor. In the Pilot Record Information Act, there's a preemption of state claims for defamation. That's, that's there. And there's also a provision which allows the inquiring party and the responding party to seek a waiver of any defamation claim that may be made by the applicant. So you're relying on the waiver? On the waiver and also there's a preemption of state law that would prevent him from bringing a defamation. I don't understand that. That would seem to suggest that the answer to the hypotheticals we were giving you before, which is what if Trans-Northern had given the same information again now, he still couldn't sue in defamation. Is that what you would say? What if Trans-Northern was asked, why did you fire this guy? And they said, now, tomorrow. And they said, because he failed an FAA alcohol test, even though in fact they now know that the FAA doesn't think he failed an FAA alcohol test. Would these waivers and this provision still preclude a defamation action? No, I don't think they would because there are, conditionally, there are provisions in the Pilot Record Information Act which say that the waiver and the preemption would only exist if there wasn't a false and malicious statement of transmission of false information or... He claims there was a false and malicious statement. He told them, he told them on July 13th or 14th that he was on duty and not only do they go and they don't change their position, they destroy the evidence. Now, that's not cool of mouth. I don't know what it is. Did they destroy the records? Did they destroy the foreign records? I don't know the answer to that question, Your Honor. He claims they did, so we have to accept that as true. So we now have them say, oh, well, in that case, we'll go and destroy the foreign records. Why is that malice? And why does that get you that exception that you talked about? Well, I don't think you get there just because of that, but... Why not? There are also other... No, no, no, no, no, no, no, no, no. Why not? Because... What's worse than destroying? You know, here it is. He says, I was on duty. You can establish it by listening to the foreign records. And they say, oh, in that case, we'll destroy the foreign records. Doesn't that sound like a 60-minute gap? Huh? You're probably old enough to remember that, right? A lot of these kids here are not old enough to remember a 60-minute gap, but I think you probably know what I'm talking about. I think so, too. I think so, too. Yeah, I think you do. So why is that just like that? Well, why isn't that just like, just like destroying the tapes, I mean, the evidence? Well... Why don't we at least have a tablish effect on whether or not your employer, your client, was malicious here? Because there was... Well, I think that this court could visit that issue, but the district court... We always do. This is what we've been doing. The district court that had all the information in front of it including what you've been talking about here in terms of the affidavit, made the determination... But you just told us we're sitting de novo and we are. So that's not useful. So let's go... You say that we're sitting de novo and we are sitting de novo. Sure. So if the issue was raised and the record supports it, we get to decide whether the district court did or not. So that's not useful. That's correct, Your Honor. Okay, so why shouldn't we do it? I mean, why... The fact that the district court thought otherwise is not a reason. So what is a reason? The fact that the district court didn't look at matters the way Judge Kuczynski is suggesting is not a reason that we shouldn't. So what is the reason why we shouldn't? I think you can, Your Honor, make your own decision as to what those facts bring to bear if they were, in fact, in front of the tribunal. Well, I just told you what's one possible thing we could do. And you and the advocates fell out of sight. Persuade us not to do that. I'm sort of thinking I will. Talk me out of it. Go on. Well, I'm not sure... I don't want to be your lawyers about it. I'm not sure, Your Honor, when all the timing of these things took place as to when... He says it happened a day or two afterwards. I told him, he said, they told me I'm not on duty. Check the tape. They say, okay, we'll destroy the tape. Bad. That's what they're saying. I mean, talk me out of it. Tell me why this isn't exactly the kind of thing for which he's entitled to bring an action and show malice. Well, I think what it would do at the very minimum would have a trial and issue a fact maybe. Exactly. That's all he wants. He's not seeking someone to judge him against him. What he sees is to go back to the district court, to that lower George courthouse and beautiful surroundings there and have a nice time. What could be better? You're a trial lawyer, right? Well, you know, I still think you can't, the court can't ever... How do you settle this case? What does Mr. Borthkin really want here? I don't know. Have you sat down with counsel and tried to work it out? I mean, it seems to me like Omni is now willing to give him a clean bill of health so he can get another job. Right? Well, if someone were to submit it and the FAA has cleared his record and expunged it like they say... Do you have any doubt on that? Well, we haven't been able to get any information that's in writing that that happened other than his word that it's happened. The June letter, it's in the record. I have it. Well, it says, and we're in the process of expunging, Your Honor, not to quibble over words, but the June 16th, the June... It says the record has been cleared and we are in the process of expunging. It doesn't say that it was done yet and we've asked since that point in time, has that ultimately been done? And we have never received a response. Your understanding that the waiver in his release is parallel to the statutory ones, so the same exception applies? I don't think so, but because it says in accordance with the Pilot Records Improvement Act, so I assume that they're parallel. I think it's a limited waiver that would waive things that were maybe accidental. That aren't known to be false. That aren't known to be false. That's true. So if your client gets evidence that in fact this has been expunged, right, your client is willing to guarantee in writing that it will give Mr. Boratkin a clean bill of health next time they get an inquiry, right? They would have to say that, I believe. Yes, Your Honor, there would be... That's not what I asked. Yes. Did you hear my question? I thought... I keep asking something, you keep answering something else. The question is, are they willing to guarantee in writing that if they're convinced that the FBI expunged this record, the next time they get a query, they will give Mr. Boratkin a clean bill of health? Yes. Have you made that clear to opposing counsel? I think you have. Well, but you know, lawyers are not just here to win cases. You know, you're here to solve problems, right? You know, to solve problems. I mean, you don't want Mr. Boratkin, you don't want Mr. Boratkin not to get another job for the rest of his life on something that's not true. I mean, your client doesn't want that, right? So get on. They have no interest in that. You guys can work it out. You know, this is a beautiful surrounding, the UNLV campus. You know, you find a nice bench here and go set up a space, okay? We're going to defer submission for a week to give counsel a chance to settle, okay? And I seriously, I think you need to seriously consider the possibility. You understand? I do, Your Honor. You have your client's phone number? Your cell phone? I do. Give it some authority and settle. Mr. Opposing counsel, I'm sorry. Mr. Grisham, are you willing to do that? Your Honor, we've tried to do that before. I don't want to hear about prior settlement negotiations. I keep asking questions, you guys keep answering, doing things. Are you willing to do this? Yes, Your Honor, we are, but there is a proviso. The damage has been done. Captain Baradgan has not flown for four years. Can he go back and apply with somebody else? Trans-Northern or somebody else up in Alaska? He can, but he has not flown for four years. You know, this is just money. You guys can work it out, just a little bit of money. I'm sure we can, Your Honor. And you know, think about, you know, much as I'm sure that the judges in the district would welcome you gentlemen back there, it would do a favor to yourselves and to the judiciary and to the public and to your clients if you could work it out with a little bit of money. I agree, Your Honor, I agree. And you can work it out. Otherwise, you'll be back trying this case. Much as cases are fun to try, it's always much better for a lawyer to solve the problem for the client rather than get a victory. Your Honor, I agree 100%. A week, we will defer submission for a week. If counsel are still in the process of negotiating and think there is a reasonable possibility that we'll proceed, they can write to us and ask for additional, such additional time, not exceeding 30 days, as you think you might reasonably need. If not, you've heard our questions. You can guess what we might do, or maybe not. But that's what makes settlement possible. Thank you very much, Your Honor. Okay. Thank you, counsel. Submission deferred. I'm sorry.
judges: Kozinski, Berzon, Bybee